# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARY E. PRICE** | : | **CIVIL ACTION** |
| *Plaintiff-pro se* | : | |
| | : | **NO. 17-5790** |
| **v.** | : | |
| | : | |
| **COMMONWEALTH CHARTER** | : | |
| **ACADEMY - CYBER SCHOOL** | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                    SEPTEMBER 12, 2019

# MEMORANDUM OPINION

## INTRODUCTION

Presently, before this Court are *cross-motions for summary judgment* filed by Plaintiff Mary E. Price ("Plaintiff"), individually, in her own right, and as legal guardian of minor child JH and as the parent of minor child TR, and by Defendant Commonwealth Charter Academy – Cyber School ("CCA"). [ECF 33, 34].[1] These motions address Plaintiff's appeal of the decisions issued by a Pennsylvania Special Education Hearing Officer ("Hearing Officer") in an underlying due process litigation brought by Plaintiff pursuant to the Individuals with Disabilities Education Act ("IDEA"),[2] 20 U.S.C. § 1400 *et seq*., which includes claims under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"). The issues before this

---

[1]     The Court is treating Plaintiff's *memorandum in support of summary judgment on the administrative and supplemental record*, [ECF 34], as a motion for summary judgment. This Court also considers the parties' responses, [ECF 38, 39], the parties' supplemental briefs concerning Plaintiff's retaliation claim, [ECF 45, 46], and Plaintiff's response to CCA's supplemental brief. [ECF 47].

[2]     The Individuals with Disabilities Education Act was amended and renamed the Individuals with Disabilities Education Improvement Act, effective July 1, 2005. *See* Pub. L. No. 108-446, 118 Stat. 2647, 2803 (2004). Notwithstanding this change in the name of the statute, courts and litigants, including the parties in this action, continue to refer to this statute as the IDEA. *See, e.g.*, *H.E. v. Walter D. Palmer Leadership Learning Partners Charter School*, 873 F.3d 406, 408 (3d Cir. 2017). For clarity, this Court will refer in this Memorandum Opinion to this statute as the IDEA.

Court are whether the Hearing Officer erred (1) in finding that CCA offered minor JH and minor TR, independently, a *free and appropriate public education* ("FAPE"), and (2) in concluding that Plaintiff was not denied meaningful participation in the development of each student's *independent educational plans* ("IEPs"). These issues have been fully briefed by the parties and are ripe for disposition. For the reasons stated herein, CCA's motion for summary judgment is granted, and Plaintiff's motion for summary judgment is denied. Accordingly, the decisions of the Hearing Officer are affirmed.

**BACKGROUND**[3]

This matter involves claims affecting two minors, JH and TR. Therefore, a separate background recitation is provided for each minor.

*Factual Background as to JH*

The facts regarding JH are as follows:

Plaintiff obtained physical custody of minor JH in October 2013, and of JH's educational decision-making rights in January 2014. [ECF 33-2 at 4]. JH has been diagnosed with an anxiety disorder and ADHD. [*Id.* at 10]. Following disputes between Plaintiff and JH's public school involving JH's IEP, Plaintiff removed JH from the school district in the spring of 2014 and enrolled him in CCA, where JH remained during the 2014-2015 and 2015-2016 school years. [*Id.* at 4-5, 10-11].

In February 2016, Plaintiff filed a special education due process complaint alleging that CCA had denied JH a FAPE in the 2014-2015 school year and continued this denial in the 2015-2016 school year. [*Id.* at 6]. In September 2016, following an administrative hearing, a hearing officer found that CCA had denied JH a FAPE in implementing JH's preexisting IEP and in designing and implementing IEP programming. [*Id.*]. Consequently, the hearing officer awarded a "make-whole" compensatory education remedy which required CCA to pay a

---

[3] The facts are taken primarily from the Hearing Officer's factual findings in each case, which are deemed to be *prima facie* correct. *See S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) ("Factual findings from the administrative proceedings are to be considered *prima facie* correct."). Additional facts which are largely undisputed, have been taken from the administrative record, supplements thereto, and the parties' respective filings. Any factual disputes, to the extent relevant, are noted.

third-party provider for a maximum of 990 hours of compensatory education per school year until such time as JH accomplished the goals from his May 2014 IEP. [*Id.*]. The hearing officer's order also required the third-party provider to disseminate quarterly progress reports to Plaintiff and CCA to gauge JH's progress in achieving the IEP goals. [*Id.*]. CCA coordinated with a third-party provider and by mid-October 2016, that provider was prepared to enroll JH; however, Plaintiff declined to sign the enrollment contract and JH did not enroll. [*Id.* at 11].

In November 2016, JH enrolled in another third-party provider's program, which was paid for by CCA pursuant to the hearing officer's September 2016 order. As part of this contract, the provider was to provide JH with 240 hours of 1-to-1 instruction and share progress reports with Plaintiff and CCA regarding the IEP goals. JH was to receive instruction for 4-6 hours per day through February 2017, which the parties agreed would substitute for JH's attendance and instruction at CCA. Thereafter, JH showed progress in achieving the IEP goals. [*Id.* at 11-13].

In December 2016, CCA requested that Plaintiff participate in an IEP development meeting. Plaintiff objected to certain details of the IEP team invitation. After CCA sent Plaintiff a draft IEP, she requested that the December 2016 IEP meeting be postponed. Ultimately, the meeting was not held. [*Id.* at 13-14].

In late January 2017, Plaintiff realized that the third-party provider was sharing progress reports with CCA and withdrew JH from the provider. [*Id.* at 11-13]. JH returned to CCA, but according to Plaintiff, JH could not access lessons or programming through CCA's online platform despite CCA's webmail system being active and emails being sent by teachers in all of JH's classes to both JH and Plaintiff. Plaintiff never notified anyone that JH could not access lessons or programming. [*Id.* at 18].

In January 2017, CCA attempted to reschedule an IEP meeting with Plaintiff, and in February 2017, a meeting was scheduled for March 2017. Plaintiff filed an action in this court seeking a temporary restraining order to stop the March 2017 IEP meeting; her request was denied. The IEP meeting was held on March 13, 2017. The attendees were to be Plaintiff, JH, CCA's director of special education, a CCA psychologist, a CCA special education manager, a CCA special education teacher, a CCA general education teacher, and a counselor contracted by CCA to provide counseling support to JH. However, Plaintiff and JH did not attend the meeting. During the meeting, the IEP team called Plaintiff to seek her participation by phone, but there was no answer and a voicemail message left for her was not returned. The March 2017 draft IEP provided to Plaintiff in preparation of the meeting contained JH's present levels of academic achievement and functional performance obtained from, *inter alia*, the third-party provider JH attended from November 2016 through January 2017, and was otherwise largely

the same as the December 2016 draft IEP. The March 2017 draft IEP indicated that Plaintiff's input would be obtained at the IEP meeting. [*Id.* at 15-16].

The March 13, 2017 IEP meeting resulted in the drafting of the April 2017 IEP. This new IEP contained significant revisions and updated information; *to wit*: the April 2017 IEP added JH's then current grades to the present level of academic achievement and functional performance contained in the March 2017 IEP; included input from JH's counselor which was offered at the March 2017 IEP meeting; added an explicit indication that the transition assessments would be administered to update transition data; amended JH's needs related to disability from "improvement in executive functioning skills" to "improvement in organizational skills"; called for JH to participate in Keystone Exams in algebra, literature, and biology with accommodations; contained goals in self-advocacy, reading comprehension, math computation, and written expression, all four of which were strengthened from his previous IEPs; removed goals in math problem solving, organization/task-approach, and auditory and language processing skills; continued to include weekly in-person support from a board-certified behavior analyst and daily in-person support from an instructional aide, but reduced the hours based on Plaintiff's historic resistance to having individuals work with JH in the family home; removed weekly virtual counseling as those services were thought to be addressed in the self-advocacy elements of the IEP; and marked giftedness as "n/a." [*Id.* at 16-18].

In February 2017 and April 2017, Plaintiff filed two administrative complaints (ODR #18768-1617 and ODR #19108-1617), which were later consolidated.[4] She raised claims under the IDEA, ADA, and Section 504. Over the course of several days between April and August 2017, an administrative evidentiary due process hearing was held before the Hearing Officer. The issues presented at the due process hearing centered on whether CCA denied JH a FAPE in: (1) its handling of data results from the third-party provider; (2) not including specific medical diagnoses in the April 2017 IEP; (3) denying Plaintiff meaningful participation in the IEP development; (4) inappropriately composing the December 2016 and March 2017 IEP teams; (5) including prejudicially deficient reports of present levels of academic and functional performance in the December 2016 and April 2017 IEPs; (6) including insufficient post-secondary transition planning

---

[4]     The consolidated administrative case ultimately gave rise to this federal action as it pertains to JH.

4

in the December 2016 and April 2017 IEPs; (7) including wrongful course placements; (8) failing to exempt JH from Pennsylvania's Keystone Exams; and (8) failing to identify JH as gifted. The Hearing Officer also considered whether CCA discriminated against JH on the basis of his disabilities in violation of Section 504.

On September 30, 2017, the Hearing Officer issued a decision essentially finding no violation of the IDEA or JH's right to a FAPE, or discrimination. [ECF 33-2]. The following is a summary of the Hearing Officer's decision:

> Plaintiff alleged that CCA did not incorporate data from the third-party provider in the December 2016 and April 2017 IEPs. The Hearing Officer noted that at the time of the December 2016 IEP, JH was in the early stages of the third-party service provider's programming and the data was still coalescing and, therefore, found that the absence of the data in the December 2016 IEP, which was merely a draft for consideration, was not inappropriate. By contrast, he noted that the relevant data was included in the April 2017 IEP. Accordingly, the Hearing Officer found that CCA's handling of the data from the third-party provider was appropriate as to both the December 2016 and April 2017 IEPs. [*Id.* at 20-21].

> Plaintiff further alleged that CCA did not incorporate JH's specific medical diagnoses in the IEPs. The Hearing Officer noted that the April 2017 IEP included specific information from a January 2017 evaluation of JH "in terms of the report's detailed characterization of [JH's] strengths and challenges." [*Id.* at 21]. He also noted that JH's specific medical diagnoses were not contained in the IEPs, but found that such absence did not render them inappropriate because IEPs were required to identify the needs of a student, and programming to meet those needs, not specific medical diagnoses, and the "December 2016 and April 2017 IEPs appropriately identify and address [JH's] needs and, through the modifications, accommodations, specially designed instruction, related services, and supports in those IEPs, provide programming that is reasonably calculated to yield meaningful education benefit based on [his] unique learning needs." [*Id.* at 22].

> Plaintiff also alleged that she was denied meaningful participation in the development of the IEPs. The Hearing Officer held that "the record supports a finding that Plaintiff has definitely chosen <u>not</u> to engage in the IEP team processes and record-sharing." [*Id.* at 23] (emphasis original). He noted that Plaintiff's complaints "all potentially point to a flawed understanding of the IEP documents shared with her," namely, that they were draft documents prepared by CCA as a starting point for the IEP process, open to collaboration and change with her input. Instead, she chose to disengage and object, rather than engage and collaborate. Additionally, Plaintiff alleged that the composition of the IEP team violated the IDEA because there was not a regular education teacher present at the IEP

meeting. The Hearing Officer noted that because the Plaintiff did not attend the March 2017 IEP meeting, it could be argued that she could not meet her burden of persuasion on the issue. However, he also found that the April 2017 IEP contained "extensive input from multiple regular education teachers from [CCA]," and "[t]herefore, . . . the insight from a regular education perspective was, on some level, part of the IEP team's deliberations." On that basis, the Hearing Officer determined that the composition of the IEP team was appropriate. [*Id.* at 24-25].

Plaintiff further alleged that the IEPs did not include JH's present levels of educational academic achievement and functional performance, *i.e.*, the present levels from the third-party provider. As with Plaintiff's allegations regarding the data from the third-party provider, the Hearing Officer concluded that the present levels were not yet developed enough for inclusion in the December 2016 draft IEP, but were included in the April 2017 IEP. [*Id.* at 25-26]. Plaintiff also challenged the post-secondary transition planning in the IEPs, but the Hearing Officer rejected these contentions. The Hearing Officer found that the April 2017 IEP was comprehensive and detailed with regard to transition planning, including the details of previous CCA assessments, the details of transition assessments from a January 2015 private evaluation, and information from the Office for Vocational Rehabilitation and the local intermediate unit in transition processes. Plaintiff challenged JH's course placements on grounds that are not exactly clear, and the Hearing Officer found that the record is silent on the details of the course placements, but that, in any event, "the goals and specially-designed instruction in the December 2016 and April 2017 IEPs, along with the totality of [CCA] communications from [JH's] teachers and the testimony of [JH's] special education teacher and mathematics teacher, all combine to provide a picture that, regardless of the exact course placement, [CCA's] programming was reasonably calculated to yield meaningful education benefit to [JH] in light of [JH's] unique needs." [*Id.* at 26-27].

Plaintiff also alleged that while both IEPs indicated that JH would participate in Pennsylvania's Keystone Exams, with accommodations, he did not take the exams. The Hearing Officer acknowledged the inconsistency, and ordered it rectified. [*Id.* at 27-28]. Finally, Plaintiff alleged that CCA failed to identify JH as gifted under Pennsylvania Chapter 16 gifted education requirements. The Hearing Officer found that Chapter 16 does not apply to charter schools and, even if it did, the record did not support any finding that JH possessed any of the criteria for gifted placement. [*Id.* at 29].

Finally, the Hearing Officer denied any claim of discrimination on the basis of disability under Section 504. [*Id.* at 30-31].

The facts regarding TR are as follows:

TR is an early-teen aged student who is Plaintiff's child. [ECF 33-3 at 3]. TR has been diagnosed with ADHD and a specific learning disability in written expression. [*Id.* at 4]. In August 2013, Plaintiff removed TR from his public-school district and enrolled him in CCA where TR remained through the 2013-2014, 2014-2015 and 2015-2016 school years. [*Id.* at 4]. In September 2015, TR was identified as also having needs in expressive language and social cognition. [*Id.* at 8].

In February 2016, Plaintiff filed a special education due process complaint alleging that CCA had denied TR a FAPE in the 2013-2014 and 2014-2015 school years which continued during the 2015-2016 school year. [*Id.* at 4]. In September 2016, following an administrative hearing, a hearing officer found that CCA had denied TR a FAPE. [*Id.*]. The hearing officer awarded an "hour-for-hour" compensatory education remedy, requiring CCA to pay a third-party provider for a maximum of 990 hours of compensatory education per school year for each year of deprivation. [*Id.* at 5]. The hearing officer's order also required the third-party provider to disseminate quarterly progress reports to Plaintiff and CCA to gauge TR's progress in achieving the IEP goals. [*Id.*]. CCA coordinated with a third-party provider and, by mid-October 2016, that provider was prepared to enroll TR; however, Plaintiff declined to sign the enrollment contract and TR did not enroll. [*Id.* at 9].

In November 2016, TR enrolled in another third-party provider's program paid for by CCA pursuant to the hearing officer's September 2016 order. Contractually, the provider agreed to provide TR with 360 hours of 1-to-1 instruction and to share progress reports with Plaintiff and CCA regarding the IEP goals. TR was to receive instruction for 4-6 hours per day through February 2017, which the parties agreed would substitute for TR's attendance and instruction at CCA. Thereafter, TR showed progress in achieving the IEP goals.

In December 2016, CCA requested that Plaintiff participate in an IEP development meeting. However, she objected to certain details of the IEP team invitation. After CCA sent Plaintiff a draft IEP, she requested that the December 2016 IEP meeting be postponed. Ultimately, the meeting was not held. [*Id.* at 10].

The December 2016 draft IEP included a special consideration that TR required assistive technology. A special consideration as to whether he had behaviors that impeded his learning, however, was not endorsed. The IEP draft contained present levels of academic achievement and functional performance, including prior evaluation data, but none from the instruction provided by the third-party provider. The IEP draft also indicated that TR's special education teacher was discussing transition planning to take place during the 2016-2017 school year and included goals regarding transition issues, specifically post-secondary

education/training and employment in the field of astronomy. The IEP draft indicated TR's needs related to his disabilities; set goals in reading comprehension, math problem-solving, and written expression; and included parental concerns. The IEP draft also indicated that TR would take Pennsylvania's PSSA tests, with accommodations. [*Id.* at 10-13].

In late January 2017, Plaintiff realized that the third-party provider was sharing progress reports with CCA and withdrew TR from the provider. [*Id.* at 9-11]. In January 2017, CCA attempted to reschedule an IEP meeting with Plaintiff but it wasn't until February 2017, that a meeting was scheduled for March 2017. Plaintiff filed an action in this court, seeking a temporary restraining order to stop the March 2017 IEP meeting; her request was denied. The scheduled IEP meeting was held on March 13, 2017. The attendees were to be Plaintiff, TR, CCA's director of special education, a CCA psychologist, a CCA special education manager, a CCA special education teacher, and a CCA general education teacher. However, Plaintiff and TR did not attend the meeting. During the meeting, the IEP team called Plaintiff to seek her participation by phone, but there was no answer and a voicemail message left for her was not returned. [*Id.* at 13].

The March 13, 2017 IEP meeting resulted in the drafting of the April 2017 IEP. This new IEP contained the same special considerations as the December 2016 draft IEP, as well as TR's current grades and teacher input as of March 2017 regarding the present levels of academic achievement and functional performance. The present levels included data and results from TR's achievement from the third-party provider. The transition section remained the same and it was again indicated that TR would take the PSSA tests with accommodations. Some of the goals remained the same, but others were strengthened and added. The April 2017 IEP included weekly in-person sessions in speech and language and occupational therapy ("OT"); weekly in-person support from a board-certified behavior analyst (1.5 hours weekly); and daily in-person support from an instructional aide (3 hours daily). Giftedness was marked "n/a"; the nature of the educational placement as to when TR would and would not participate with students without disabilities was not indicated; and there was no explicit calculation of the percentage of the instructional day in which TR would participate in regular education. [*Id.* at 14].

In February 2017 and April 2017, Plaintiff filed two administrative complaints (ODR #18809-1617 and ODR #19109-1617), which were later consolidated.[5] Over the course of several days between April and August 2017, an administrative evidentiary due process hearing was convened before the Hearing Officer. The issues at the due process hearing centered on whether

---

[5] The consolidated administrative case ultimately gave rise to this federal action, as it pertains to TR.

CCA denied TR a FAPE through: (1) its handling of data results from the third-party provider; (2) denying Plaintiff meaningful participation in the IEP development; (3) inappropriately composing the December 2016 and March 2017 IEP teams; (4) including prejudicially deficient special considerations and reports of present levels of academic and functional performance in the December 2016 and April 2017 IEPs; (5) including a prejudicially deficient educational placement and/or calculation of hours-in-regular-education; (6) including inappropriate post-secondary transition planning in the December 2016 and April 2017 IEPs; (7) including wrongful student enrollment information; (8) not requesting permission to evaluate TR for OT needs; (9) failing to exempt TR from Pennsylvania's PSSA tests; and (10) failing to identify TR as gifted. The Hearing Officer also considered whether CCA discriminated against TR on the basis of his disabilities, in violation of Section 504.

On September 30, 2017, the Hearing Officer issued a decision finding no violation of the IDEA or TR's right to a FAPE, or discrimination. [ECF 33-3]. The following is a summary of the Hearing Officer's decision:

> Plaintiff alleged that CCA did not incorporate data from the third-party provider in the December 2016 and April 2017 IEPs. The Hearing Officer noted that at the time of the December 2016 IEP, TR was in the early stages of the third-party service provider's programming and the data was still coalescing and, therefore, found that the absence of the data in the December 2016 IEP, which was merely a draft for consideration, was not inappropriate. By contrast, he noted that the relevant data was included in the April 2017 IEP. Accordingly, the Hearing Officer found that CCA's handling of the data from the third-party provider was appropriate as to both the December 2016 and April 2017 IEPs. [*Id.* at 16-17].

> Plaintiff also alleged that she was denied meaningful participation in the development of the IEPs. The Hearing Officer held that "the record supports a finding that Plaintiff has definitely chosen not to engage in the IEP team processes and record-sharing." [*Id.* at 18] (emphasis original). He noted that Plaintiff's complaints "all potentially point to a flawed understanding of the IEP documents shared with her," namely, that they were draft documents prepared by CCA as a starting point for the IEP process, open to collaboration and change with her input. Instead, she chose to disengage and object, rather than engage and collaborate. He also rejected Plaintiff's allegations that CCA interfered with her ability to prepare

for the administrative proceedings, noting that records were made available to her, but that she refused delivery of the electronic storage device (a flash drive). [*Id.*]. Additionally, Plaintiff alleged that the composition of the IEP team violated the IDEA because the regular education teacher present at the March 2017 IEP meeting was inappropriate. The Hearing Officer noted that the regular education teacher invited was TR's art teacher, which procedurally satisfied the IDEA's requirement that "'not less than one regular education teacher of the child (if the child is, or may be, participating in the regular education environment' be an attendee at the IEP meeting." [*Id.* at 20] (quoting 34 C.F.R. 300.321). In any event, the Hearing Officer further noted that, substantively, "the April 2017 IEP contains extensive and, as of March 2017, quite recent input from multiple [CCA] regular education teachers of [TR]," and, "[t]herefore, the insight from a regular education perspective was both procedurally and substantively part of the IEP team's deliberations." [*Id.*].

Plaintiff further alleged that the IEPs did not include TR's present levels of educational academic achievement and functional performance, *i.e.*, the present levels from the third-party provider. As with Plaintiff's allegations regarding the data from the third-party provider, the Hearing Officer concluded that the present levels were not yet developed enough for inclusion in the December 2016 draft IEP, but were included in the April 2017 IEP. [*Id.* at 20-21]. With regard to special considerations, the Hearing Officer noted CCA's position that any manifestation of TR's impairments had not appeared in recent CCA instructional environments, and found that the record seemed to support that position. However, he further noted that the terms of the IEPs revealed that TR had needs in organization/attention/task-approach, and social skills, and found that the weekly in-person services called for in the IEP should address those issues. He ordered that CCA continue to monitor these issues. [*Id.* at 21-22].

The Hearing Officer agreed with Plaintiff's allegation that the April 2017 IEP was missing a description of the nature of the educational placement as to when TR would/would not participate with students without disabilities in non-academic activities, in a regular classroom, and in the general education curriculum, as well as the explicit PennData calculation of the percentage of the instructional day in which TR would participate in regular education. The Hearing Officer directed CCA to indicate the placement information and calculation in TR's IEP. [*Id.* at 22].

With regard to Plaintiff's allegation that transition planning was deficient, the Hearing Officer noted that CCA was just at the outset of planning as TR had only qualified for transition programming in the 2016-2017 school year. He further noted that TR's post-secondary education and employment goals were listed, along with activities related to each, and in the 2016-2017 school year, TR worked with teachers in CCA's middle school transition-planning curriculum. For these reasons, the Hearing Officer determined that the transition planning in the IEPs was appropriate, and TR had not been denied a FAPE in this regard. [*Id.* at 22-23].

Plaintiff further alleged that TR's enrollment date was erroneously listed in the IEPs as the 2012-2013 school year, instead of the correct school year of 2013-2014. The Hearing Office found the error was administrative and harmless, but still directed CCA to correct the information. [*Id.* at 23]. With regard to Plaintiff's allegation that CCA should have ordered an OT evaluation, the Hearing Officer noted the IEP's robust programming regarding OT, and found no reason to fault CCA for not pursuing an OT evaluation. [*Id.* at 23-24].

Plaintiff also alleged that while both IEPs indicated that TR would participate in Pennsylvania's PSSA testing, with accommodations, he did not take the testing. The Hearing Officer acknowledged the inconsistency, and ordered it rectified. [*Id.* at 24]. Finally, Plaintiff alleged that CCA failed to identify TR as gifted under Pennsylvania Chapter 16 gifted education requirements. The Hearing Officer found that Chapter 16 does not apply to charter schools and, even if it did, the record did not support any finding that TR possessed any of the criteria for gifted placement. [*Id.* at 24-25].

Finally, the Hearing Officer denied any claim of discrimination on the basis of disability under Section 504. [*Id.* at 26-27].

*Procedural Background*

On December 28, 2017, Plaintiff timely filed a complaint in federal court appealing the administrative decisions. This complaint was amended twice. The operative complaint was filed on June 27, 2018; included claims under the IDEA, the Americans with Disabilities Act ("ADA"), Section 504, and 42 U.S.C. § 1983 (for retaliation); and essentially argued that the Hearing Officer erred by concluding (1) that CCA offered JH and TR FAPEs, and (2) that Plaintiff was not deprived of her right to meaningfully participate in the IEP development process. [ECF 17].

**LEGAL STANDARD**

Under the IDEA, institutions that receive federal education funding are required to provide all children with disabilities a free and appropriate public education ("FAPE"). 20 U.S.C. § 1400(d)(1)(A); § 1412(a)(1)(A); *Endrew F. ex rel. Joseph F. v. Douglas Sch. Dist.*, 137 S. Ct. 988, 993 (2017); *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012). A FAPE "includes both 'special education' and 'related services.'" *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C.

§ 1401(26), (29)).  Once a disabled child is identified, the School District must develop an independent educational plan or IEP for the child that is "reasonably calculated to enable [the student] to make progress appropriate in light of the child's circumstances." *Id.* at 1001; *see also* 20 U.S.C. § 1414(d) (defining individualized education program).[6]  "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Id.*  It must "set out a plan for pursuing academic and functional advancement." *Id.* at 999 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV)).  Although the state is not required to "maximize the potential of every handicapped child," it must provide an education that confers a "meaningful benefit" to each child. *Ridley School Dist. v. M.R.* 680 F.3d 260, 268 (3d Cir. 2012).  The benefit must be substantial, not minimal. *Endrew F.*, 137 S. Ct. at 1001.

The core of the IDEA is the collaborative process between parents and school officials to fashion the IEP. *Id.* (citing 20 U.S.C. § 1414).  This collaboration among the parents and educators ensures careful consideration of the child's individual circumstances. *Id.*  "It is through the IEP that [t]he 'free appropriate public education' required by the Act is tailored to the unique needs of a particular child." *Id.* at 1000 (internal quotations omitted).  The IDEA "requires that every IEP include 'a statement of the child's present levels of academic achievement and functional performance,' describe 'how the child's disability affects the child's involvement and progress in the general education curriculum,' and set out 'measurable annual goals, including academic and functional goals,' along with a 'description of how the child's progress toward meeting' those goals will be gauged." *Id.* at 994 (citing 20 U.S.C. § 1414(d)(1)(A)).  "An IEP is not a form

---

[6]     An IEP is a "written statement for each child with a disability" that includes a statement of the child's: (1) present levels of achievement and performance; (2) measurable annual goals; and (3) the special education and supplementary aids and services to be provided to the child, as well as other details regarding the child's educational program.  20 U.S.C. § 1414(d)(1)(A)(I-IV).

document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id.* at 999.

If parents believe that an IEP fails to provide their child with a FAPE, they may seek an administrative "impartial due process hearing." 20 U.S.C. § 1415(f). "Any party aggrieved by the findings and decision" made in the administrative proceeding "shall have the right to bring a civil action" in state or federal court. 20 U.S.C. § 1415(i)(2)(A). The district court shall review the record of the administrative proceedings, shall hear additional relevant, non-cumulative and useful evidence at the request of a party, and, based on a preponderance-of-the-evidence standard, grant such relief as it deems appropriate. 20 U.S.C. § 1415(i)(2)(C); *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 760 (3d Cir. 1995). The district court must give "due weight" to the hearing officer's decision. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982).

The concept of "due weight" requires a district court to conduct a "modified *de novo* review" of the administrative proceedings. *Shore Reg. High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004); *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). Thus, courts are not free to "substitute their own notions of sound education policy for those of the educational agencies they review." *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995) (citing *Rowley*, 458 U.S. at 205-06). A district court reviewing an administrative fact-finder's conclusions must defer to such factual findings unless the court identifies contrary, non-testimonial evidence in the record, or explains why the record, read in its entirety, compels a different conclusion. *S.H.*, 336 F.3d at 270. The district court's review of a hearing officer's application of legal standards and conclusions of law, however, requires no deference to the administrative hearing officer's legal determinations; rather, the legal

determinations are subject to plenary review. *Id*. at 271; *Warren G. v. Cumberland Cty. Sch. Dist.*, 190 F.3d 80, 83 (3d Cir. 1999).

The party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged. *M.R.*, 680 F.3d at 270 (citations omitted). As the Supreme Court noted, "[t]he burdens of pleading and proof with regard to most facts have been and should be assigned to the [party] who . . . seeks to change the present state of affairs." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005) (quoting 2 McCormick on Evidence § 337 at 412 (7th ed.)). Under the IDEA, it is the party "aggrieved by the findings and decision" of the hearing officer that seeks to change the present state of affairs. *See* 20 U.S.C. § 1415(i)(2)(A). "Absent some reason to believe that Congress intended otherwise," the burden of persuasion falls where it usually does, on the party seeking relief. *Schaffer*, 546 U.S. at 57-58.

## DISCUSSION

With these legal principles in mind, this Court will separately address the issues raised as to each student.

*IDEA Claims*

CCA argues that this Court should not consider Plaintiff's claims regarding the various draft IEPs issued for JH and TR. The Court agrees. The draft IEPs were provided to Plaintiff with explicit instructions that they would "serve as a starting point for working as a team" at the IEP meetings. Accordingly, since the draft IEPs were for discussion purposes *only*, CCA cannot be found liable based on any alleged deficiencies in the drafts. *See Coale v. Del. Dep't of Educ.*, 162 F. Supp. 2d 316, 327 (D. Del. 2001) (refusing to allow parent to pursue claims based upon a discussion draft of IEP provided in advance of the meeting, when parent postponed the meeting).

The Court also rejects Plaintiff's many procedural arguments, *i.e.*, that the Hearing Officer erred by "unilaterally" extending the decision due date and by not issuing his decisions in a timely fashion. After reviewing the procedural process, it is this Court's opinion that the Hearing Officer did not abuse his discretion in these procedural actions. *A.S. v. William Penn Sch. Dist.*, 2014 U.S. Dist. LEXIS 50261, at *15-16 (E.D. Pa. Apr. 10, 2014) (standard of review for procedural actions taken by hearing officers during the administrative proceedings).

*IDEA Issues Raised as to JH*

With regard to Plaintiff's allegation that JH's April 2017 IEP did not include up-to-date data from the third-party provider, Plaintiff concedes that such information was provided but contends that information was "subjective" and "consisted of summarized excerpts" of progress reports which "were of little, to no, value because they lacked context and failed to disclose that the instructional materials utilized by [the third-party provider] are proprietary and have no direct correlation to a public school, [sic] general education curriculum." Plaintiff also argues that "it remains unclear as to what information the IEP Team reviewed and discussed during the March 13, 2017 IEP meetings that allowed the IEP Team to determine JH's . . . deficits and baselines for the purposes of identifying goals, specially designed instruction, and related services." Based on the evidence of record, the Hearing Officer properly rejected Plaintiff's allegations. The relevant data was incorporated into the IEP. It is unfortunate that Plaintiff chose not to participate in the meeting, but on this record the Court finds no error.

As to Plaintiff's allegation concerning the lack of specific medical diagnoses in JH's IEP, Plaintiff apparently concedes that the diagnoses were not required under the IDEA, but still seems to argue that the IEP was deficient because of their exclusion. As the Hearing Officer explained, it is undisputed that JH had disabilities which qualify JH for special education services. Under the

IDEA, CCA is required to "create and implement an [IEP] based on [JH's] needs and areas of disabilities." *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 426 (3d Cir. 2013). Whether CCA did so is the question the Hearing Officer was tasked with addressing; whether JH's specific medical diagnoses were listed in the IEP is not relevant. Clearly, the Hearing Officer reviewed the record and found that the April 2017 IEP included JH's strengths, challenges, needs, and identified modifications, accommodations, specially designed instruction, related services, and supports reasonably calculated to address JH's needs. Under the circumstances noted, this Court finds that the Hearing Officer did not err in rejecting Plaintiff's argument that JH was denied a FAPE by CCA not including the specific medical diagnoses in the IEP.

As to Plaintiff's assertion that CCA denied her right to meaningfully participate in the development of JH's IEP, Plaintiff cites a litany of frustrations in her communications with CCA, perceived slights, and issues with JH's Keystone Exams (*i.e.*, the April IEP 2017 stating that JH would need to take the exams with accommodations, despite Plaintiff's position that JH should have been exempted and JH ultimately not taking the exams). However, it is undisputed that Plaintiff affirmatively chose not to participate in the IEP meetings, despite every effort being made by CCA to include her in the process. This Court, therefore, finds that the Hearing Officer did not err in rejecting this claim.

As to Plaintiff's allegation that a regular education teacher did not attend the March 2017 IEP team meeting, the record is unclear. CCA's director of special education testified at the administrative hearing that the regular education teacher listed on the IEP sign-in sheet did attend the meeting. (Tr. at 690). The same sign-in sheet, however, lists the regular education teacher among the "IEP team members [who] were unable to attend the IEP meeting and have submitted written input," which was incorporated into the IEP. (CCA Ex. 28 at 3). At the administrative

hearing, Plaintiff did not question CCA's special education director about this discrepancy. In any event, the Hearing Officer concluded that: 1) Plaintiff did not meet her burden of establishing that a regular education teacher did not attend the meeting, because Plaintiff herself was not at the meeting and the only unchallenged testimony at the hearing was that a regular education teacher did attend the IEP meeting; and 2) it is clear from the record that the written input of multiple regular education teachers was included in the April 2017 IEP. While the presence of the regular education teacher is preferred, the possible absence did not deprive JH of a FAPE where the IEP included the input of multiple regular education teachers. This Court finds no merit to Plaintiff's contention.

With regard to Plaintiff's allegation that the April 2017 IEP did not include JH's present levels of academic and functional performance from the third-party provider, Plaintiff is mistaken. This information was included in the April 2017 IEP. To the extent Plaintiff contends that this information was insufficient because it did not include the full text of the "Yellin Report," the Court agrees with CCA's position that the Yellin Report was considered by the IEP team, as evidenced by the testimony of CCA's school psychologist Emily Stine, and the IEP itself. (Tr. at 296-303). Thus, the Hearing Officer did not err in rejecting this claim.

As to Plaintiff's claims regarding transition planning, JH's course placements, and CCA's failure to identify JH as gifted, Plaintiff provides no argument. This Court, however, finds that the Hearing Officer did not err in rejecting these claims for the reasons provided.

*IDEA Issue Raised as to TR*

With regard to Plaintiff's allegation that TR's April 2017 IEP did not include up-to-date data from the third-party provider, Plaintiff concedes that such information was provided but contends that information was "subjective" and "consisted of summarized excerpts" of progress

reports which "were of little, to no, value because they lacked context and failed to disclose that the instructional materials utilized by [the third-party provider] are proprietary and have no direct correlation to a public school, [sic] general education curriculum." Plaintiff also argues that "it remains unclear as to what information the IEP Team reviewed and discussed during the March 13, 2017 IEP meetings that allowed the IEP Team to determine . . . TR's . . . deficits and baselines for the purposes of identifying goals, specially designed instruction, and related services." Based on the evidence of record, the Hearing Officer properly rejected Plaintiff's allegations. The relevant data was incorporated into the IEP. It is unfortunate that Plaintiff chose not to participate in the meeting, but on this record the Court finds no error.

Relatedly, as to Plaintiff's assertion that CCA denied her right to meaningfully participate in the development of TR's IEP, Plaintiff cites a litany of frustrations in her communications with CCA, perceived slights, and issues with TR's PSSA tests (*i.e.*, the April IEP 2017 stating that TR would need to take the tests with accommodations, despite Plaintiff's position that JH should have been exempted and TR ultimately not taking tests). However, it is undisputed that Plaintiff affirmatively chose not to participate in the IEP meetings, despite every effort being made by CCA to include her in the process. This Court, therefore, finds that the Hearing Officer did not err in rejecting this claim.

With regard to Plaintiff's allegation that the April 2017 IEP did not include TR's present levels of academic and functional performance from the third-party provider, the Court finds that the Hearing Officer committed no error in rejecting this claim as the information was included in the April 2017 IEP.

As to Plaintiff's claims regarding TR's course placement, transition planning, incorrect enrollment date, OT, and CCA's failure to identify TR as gifted, Plaintiff makes no argument in

this Court regarding these issues.  As relevant, this Court finds that the Hearing Officer did not err in ordering CCA to revise the April 2017 IEP to include a description of TR's course placement and the amount of time he would participate in a regular education classroom, without awarding other relief to Plaintiff, and that Plaintiff failed to establish that TR would qualify for gifted programming.

*ADA and Section 504 Claims*

To obtain relief under the ADA or Section 504, the evidence must show that a student with disability, who was otherwise qualified to participate in a program of a recipient of federal funding, was denied the benefits of the program or was otherwise subject to discrimination. *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999); *McDonald v. Com. of Pa., Dept. of Public Welfare, Polk Ctr.*, 62 F.3d 92, 94-95 (3d Cir. 1995).  A showing of deliberate indifference on the part of the school is also required.  *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262-63 (3d Cir. 2013).  Here, Plaintiff failed to establish that either JH or TR was denied Participation in CCA's academic program because of their disabilities, let alone that CCA was deliberately indifferent to their disabilities.  Under the circumstances, Plaintiff's ADA and Section 504 claims fail.[7]

*42 U.S.C. § 1983 Retaliation Claim*

Neither party's summary judgment motion addressed Plaintiff's § 1983 retaliation claim. In an Order dated June 5, 2019, this Court noted as much, as well as the fact that Plaintiff did not

---

[7]     The Court notes that the Hearing Officer did not explicitly state that Plaintiff brought ADA claims on behalf of JH and TR, or specifically address these claims.  However, given that Plaintiff's Section 504 and ADA claims are governed by the same standard, *see S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 260 (3d Cir. 2013), as well as the Hearing Officer's statements in each decision that "[t]he student was not discriminated against on the basis of disability," and that "[a]ny claim not specifically addressed in this decision and order is denied," the Court construes the Hearing Officer's decisions as denying Plaintiff's ADA claims.

appear to have raised this claim in the administrative proceedings.  [ECF 44].  Accordingly, the Court ordered the parties "to file briefs addressing whether the retaliation claim at Count IV was exhausted, whether this Court has jurisdiction over Count IV, and any other pertinent issues or arguments related to the merit of the retaliation claim at Count IV."  [*Id.*].  In her supplemental brief and response to CCA's supplemental brief, Plaintiff concedes that she did not raise her § 1983 claim in the administrative proceedings but contends that her failure to do so is excused because the relief she is seeking was not fully available in the administrative proceeding.  [ECF 45, 46].  CCA, in turn, argues that the relief Plaintiff sought in her § 1983 claim was available under the IDEA; that she was, therefore, required to exhaust her administrative remedies; and that because she did not raise it in the administrative proceedings, this Court lacks subject-matter jurisdiction over the claim.  [ECF 47].  This Court agrees with CCA.

The IDEA requires the exhaustion of administrative remedies, *i.e.*, the raising of a claim in the administrative proceedings.  *See* 20 U.S.C. § 1415(f), (i)(2)(A).  This exhaustion requirement extends to non-IDEA claims that seek relief that is available under the IDEA.  *Id.* § 1415(l) ("Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C. *12101 et seq.*], title V of the Rehabilitation Act of 1973 [29 U.S.C. 790 *et seq.*], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter."); *see also  Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014) ("Exhaustion of the IDEA's administrative process is also required in non-IDEA actions where the plaintiff seeks relief that can be obtained under the IDEA.").  The Third

Circuit has held that § 1983 claims brought by parents claiming retaliation as a result of their efforts to vindicate their child's right to FAPE can be asserted under the IDEA and, thus, must be administratively exhausted. *S.D. by A.D. v. Haddon Heights Bd. of Educ.*, 722 F. App'x 119, 126 (3d Cir. 2018). Thus, since Plaintiff did not raise a § 1983 retaliation claim in the administrative proceedings, this the claim is not exhausted and, therefore, is dismissed for a lack of subject-matter jurisdiction.

**CONCLUSION**

This Court finds that the administrative record supports the facts and the legal conclusions reached by the Hearing Officer. These findings are consistent with the requirements of the IDEA. Therefore, for the reasons set forth, Plaintiff's retaliation claim at Count IV is dismissed for lack of subject-matter jurisdiction, the decision of the Hearing Officer is affirmed, Plaintiff's motion for summary judgment is denied, and CCA's motion for summary judgment is granted. Plaintiff's motion to introduce additional evidence is also denied. An appropriate Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO,* U.S.D.C. J.